## JONES VS. MCLEAN, SURV. ET AL.

The rate of interest that a commission merchant may charge is regulated by legislative enactment, and not by the custom of merchants.

The charge of a commission merchant for accepting a draft is but a legal compensation for the benefit of his name and credit and in consideration of his risk, and is not regarded as interest: But a charge for paying such draft at maturity is regarded as interest on the money advanced; and if the commission and interest together exceed the legal rate of interest, it will be deemed usurious.

A mortgage or deed of trust, executed in this State to secure a usurious demand, would be null and void, and a Court of chancery would not entertain a bill to foreclose, against the plea of usury; but where the defendant by his answer does not insist that such mortgage, etc., be declared void for usury, but merely that it be opened and the transaction cleansed of the usurious charges, the Court should open the mortgage; cause the account between the parties to be re-stated, purging it of usury; and render a decree for such amount as is legally and equitably due.

*Appeal from the Circuit Court of Lafayette county in chancery.*

The Hon. SHELTON WATSON, Circuit Judge.

WATKINS & CURRAN, and GALLAGHER, for the appellant.

PIKE & CUMMINS, for the appellees.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

This was a bill to foreclose several mortgages, determined in the Lafayette Circuit Court.

The bill was originally filed in the names of James Dick, Harry R. W. Hill and Wm. J. McLean, as surviving partners of the firm of N. &. J. Dick & Co., against Isaac N. Jones, Jason C. Wilson and others. After the bill was filed, the death of James Dick was suggested, and the cause ordered to progress in the names of the surviving complainants. After this, Hill

departed this life, and his executors, John M. Bass and John Memfield, were made parties.

The original complainants were the successors and survivors of the firms of N. & J. Dick & Co., Dick & Hill, Hill, McLean & Co., and W. & J. Dick & Co., a commission house of New Orleans. The defendant Jones was a planter of Lafayette county, Arkansas.

The case made for the complainants is substantially as follows:

Jones commenced doing business with the house of complainants at New Orleans as far back as the year 1835, and continued to do business with it, up to and after the time of filing the bill in September, 1848. He shipped his cotton to the house, drew drafts, etc., upon it, and received supplies for his plantation from it.

There was a branch of the same house at Nashville, Tennessee, conducted under the style of H. R. W. Hill & Co., with which Jones had dealings before and after he commenced business with the New Orleans house. His dealings with the Nashville house were confined mostly to its making advances to him, by accepting or discounting his drafts, etc.

On the 28th January, 1837, his account with the Nashville house was closed to that date, and on crediting him with a draft for $29,014 73, drawn by him on that day upon the New Orleans house, there was a balance in his favor of $21,477 57, which balance the Nashville house transferred to his credit on the books of the New Orleans house.

It does not appear that he had any settlement with N. & J. Dick & Co., the New Orleans house, from the time he commenced doing business with them until May, 1839, though it is more than probable, from the pleadings and evidence in the cause, that accounts current were made out and transmitted to him annually, showing the balances against him, etc.

About the 1st day of May 1839, James H. Wilson, an agent of the house, came to Arkansas, for the purpose of making a settlement with Jones, and securing the balance due from him, etc. At which time it seems the balance against him, upon an

30

account as stated by the House, was $48,589 95. Upon this amount, Wilson, in making a settlement with Jones, allowed him an absolute credit for $6,181 19, on account of notes, drafts, etc., turned over by him to Wilson for the benefit of the house, thereby reducing his indebtedness to $42,408 76. For $5,000 of this amount, Jones executed his bond with one Giles as security. To secure the payment of this bond and $37,408 76, balance due upon the account stated, Jones also executed to the firm a mortgage upon his plantation (improved public lands) in Lafayette county, and forty-one slaves employed in the cultivation thereof, conditioned in the following words, etc:

"But this obligation is upon the express condition that if I, the said Isaac N. Jones, shall pay or cause to be paid to said James Dick, etc., etc., surviving partners of the firm of N. & J. Dick & Co., the sum of $37,408 76, the amount with and by which I stand indebted to the said firm, etc., upon an account stated between myself and said firm on the 1st of May, 1839, for divers goods, wares and merchandize before that time sold and delivered to me at my request: and for divers moneys laid out and expended for me, and in and about my business at my like request: and for divers sums of money loaned me and at my like request, all before said day: and also pay or cause to be paid to said James Dick, etc., etc., the further sum of $5,000, with interest on the first mentioned sum at the rate of eight per cent. per annum from the 1st of May, 1839, and interest on the last mentioned sum at the rate of ten per cent per annum, then this obligation, and also a note of hand commonly called a written obligation bearing even date herewith, given by myself and a certain James Giles to the said firm of N. &. J. Dick & Co., for the said sum of $5,000 last mentioned to be paid one day after the date thereof, with interest from the said 1st of May, and also said account stated, shall all be void and of no effect, etc.

The mortgage is not dated but it appears to have been executed on the 24th of May, 1839, the day on which the settlement between Wilson and Jones seems to have been finally made.

On the 14th January, 1840, Jones executed another mortgage upon additional slaves, to secure the same debts, as follows:

" Know all men, etc., that I, Isaac N. Jones, of, etc., for and in consideration of my indebtedness to N. & J. Dick & Co., of New Orleans, upon an account stated between us, on the 24th day of May, 1839, and note of same date for $5,000, due one day after date, for securing which I executed a mortgage of that date upon sundry slaves, etc., etc., do hereby give, grant, sell and convey to the said N. & J. Dick & Co., etc., the following named slaves [here the names of eighteen negroes are stated,] to have and to hold, etc., etc. Provided, nevertheless, if I, the said Isaac N. Jones, etc., shall pay to he said N. & J. Dick & Co., the amount specified in said account stated, and also the sum of $5,000, with eight per cent. interest upon said account stated, and ten per cent. per annum interest upon said sum of $5,000, then this obligation, said account stated, and also a writing obligatory, dated said 24th of May, signed by me and a certain James Giles, and payable to the said N. & J. Dick & Co., for $5,000, to be void."

On the 12th day of March, 1841, Jones executed a deed of trust to Jason C. Wilson, reciting that he was indebted to the surviving partners, etc., of the firm of N. & J. Dick & Co., in the sum of $42,408 76, secured to be paid by the above mortgages, reciting them, and that a large portion of said debt remained unpaid, which he was desirous of paying out of the produce of the plantation, etc.: and conveying to Wilson the mortgaged property, and the horses, cattle, etc., etc., on the place, in trust to carry on the plantation, sell the crops and pay off said debt, only reserving enough every year to supply the place, and support Jones' family. This trust not to interfere with the mortgages, or the right of the survivors, etc., of N. & J. Dick & Co., to enforce the mortgages and collect their debt, etc.

On the 22d February, 1843, Jones, having perhaps procured titles to the lands embraced in the first mortgage and in the deed of trust to Wilson, executed another deed to Wilson, conveying to him the lands, by their numbers, on the same trusts and conditions, as in the original trust deed to Wilson.

The above deeds were all executed and recorded in Lafayette county, where Jones resided, and the property was situated.

The bill was filed on the 18th of Sept., 1848, setting out and exhibiting the mortgages and deeds of trust, and praying foreclosure and sale of the property for the payment of the balance due upon the debts.

Complainants also exhibited with the bill accounts current, numbered from 1 to 14, showing the state of Jones' accounts with the House as conducted by the several firms successively from the year 1835 to the date of the first mortgage, and after, to the time of filing the bill, and showing the balance claimed to be due from Jones, etc.

Jones admits, in his answer, the execution of the several deeds, etc., exhibited with the bill. He also admits that he was largely indebted to the firm of N. & J. Dick & Co., at the date of the first mortgage, but denies his indebtedness to have been as large as therein stated. On the contrary, he avers that when the mortgage was given, no *settlement* was made, and the actual amount due from him to the house was not ascertained: but a sum large enough to cover the amount was inserted in the mortgage, and the whole matter was to remain open subject to future adjustment. He then proceeds to allege and specifiy various errors, mistakes, omissions of credits, improper charges, and charges for excessive and usurious interest in the several accounts current prior to the mortgage, exhibited with the bill; which errors, etc., etc., having been embraced in the amount of debt covered by the mortgage, he prays that the mortgages may be opened, and the accounts re-stated, etc.

The cause was finally heard upon the pleadings and evidence at the May term, 1853; and the Court holding that the mortgages were not successfully impeached on account of any of the matters alleged in the answer of Jones, refused to open them: but ordered the master to take and state an account of payments made by Jones upon the mortgage debts, etc., and to ascertain the balance due, etc.

The master, after allowing Jones credits claimed by him on account of proceeds of cotton, etc., shipped by him to complain-

OF THE STATE OF ARKANSAS. 461

Term, 1857.]                    Jones vs. McLean sur. et al.

ants after the date of the first mortgage, less the value of sup-
plies furnished him by complainants, reported a balance against
him of $18,790 56, as of 2d Nov., 1853, at which time a final
decree was rendered against him for that amount, the mort-
gages foreclosed, and the property ordered to be sold to satisfy
the decree, etc.

From this decree both parties appealed to this Court.

The grounds upon which complainants appealed are not urged
by their counsel here, and their appeal may be disposed of by
a general remark, that there is no error in the decree of which
they have any just cause to complain.

There seems to be no serious dispute between the parties as
to the amounts with which Jones was. charged for supplies and
credited by proceeds of cotton, etc., etc., subsequent to the first
mortgage, by the master's report, and the decree of the Court
below.

The controversy here relates to the accounts current exhibit-
ed with the bill, which produced the balance against Jones, for
which the first mortgage was executed.

1. The statement in Jones' answer, that when the first mort-
gage was given no settlement was made, and the actual amount
due from him not ascertained, but a sum inserted large enough
to cover the amount: and that the whole matter was to remain
open subject to future adjustment, is contradicted by the deposi-
tion of James H. Wilson, the agent of the house of N. & J. Dick
& Co., who made the settlement, and took the mortgage. It is
also at variance with the recitals contained in the first as well
as the second mortgage, and the deed of trust to Jason C. Wil-
son. Nor is there any intimation that such was the understand-
ing of Jones in any of the letters read upon the hearing addres-
sed by him to a member of the firm in reference to his indebt-
edness to the house after the execution of the first mortgage.
It.is more than probable, as above remarked, from all the facts
of the case, that accounts current had been annually transmit-
ted to him by the house, showing the state of his indebtedness,
etc., and that he made the settlement with James H. Wilson,
and executed the first mortgage, upon an account stated to that

time. Such is our conclusion, at least, upon the pleadings and evidence relating to this point, whatever may have been the truth of the matter. And this conclusion disposes of most of the objections made by Jones to the accounts.

2. There is one serious objection, however, made to the accounts by Jones, which is not thus disposed of: that is, that upon the face of the accounts, it appears that he was charged with usurious interest, which was carried into the mortgage.

At the foot of the debit side of his account with the Nashville House, closing 28th Janury, 1837, there is a charge of "*interest in our favor to date*, $126 10," but upon what item in the account it is charged, or at what rate, does not appear on the face of the account.

Upon the face of his accounts current with the New Orleans House, it plainly appears that he was charged with *ten per cent.* interest upon various items and the same rate of interest upon the annual balances against him, etc. He was also charged with two and a half per cent. commissions for accepting drafts drawn by him upon the house: the same per cent. for advancing money to pay them at maturity, and ten per cent. interest upon the commissions and sums so advanced.

It appears from depositions read at the hearing on the part of complainants, that, during the period of time covered by those accounts, it was the custom in New Orleans for commission merchants to charge planters two and a half per cent. commissions for accepting drafts drawn in anticipation of their crops, a like per cent. for advancing money to meet them at maturity, and ten per cent. interest, etc.

The rate of interest, however, is regulated by legislative enactments, and not by custom. We must therefore look to the statutes of Louisiana, where the accounts in question were contracted and to be paid, to determine what rate of interest was legally chargeable upon them. By agreement of the parties, these statutes are to be regarded as proven and in evidence.

*From the civil code:* "Art. 2,895. Interest is either legal or conventional. Legal interest is fixed at the following rates, to wit: At five per cent. on all sums which are the subject of ju-

dicial demand, whence this is called judicial interest; and on sums discounted by Banks, at the rate established by their charters.

" The amount of the conventional interest cannot exceed ten per cent· The same must be fixed in writing; and testimonial proof is not admitted in any case.

" Art. 1,934. Interest upon interest cannot be recovered, unless it be added to the principal, and by another contract made a new debt. No stipulation to that effect in the original contract is valid."

These statutes seem to have been in force in Louisiana from the time of the commencement of the accounts current in question, until after the date of the first mortgage. We shall look to the decisions of the Supreme Court of that State for the interpretation which they have received there.

It is manifest that the charge of interest at the rate of ten per cent. in the several accounts was excessive and usurious, being double the rate allowed by the statute.

It has been held by the Supreme Court of Louisiana, that the charge by a commission merchant of two and a half per cent. for accepting a planter's draft is but a legal compensation for the benefit of the name and credit of the acceptor in the negotiation of the draft, and a consideration for the risk incurred by the acceptance: and such commission is not to be regarded as *interest*.

It is not usurious, therefore, for the merchant to charge two and a half per cent. for accepting the draft; and the highest legal rate of interest (or by agreement in writing, the highest conventional rate) upon money advanced by him to pay the draft at maturity. *Lalande vs. Breaux*, 5 *La. Ann. Rep.* 506.

" But," say the Court in the same case, " in our opinion, the charge of two and a half per cent. commission for advancing, together with eight per cent. interest from the date of the advance, stands upon a very different footing. Names do not alter the substance of things. To agree with a party that you will make an advance of money to him, (or to his creditor holding his draft, accepted by you for his accommodation in con-

sideration of a commission of two and a half per cent, and which draft he has failed to pay,) and that he shall restore, first, the money with eight per cent. interest from the date of the advance, and besides, a commission of two and a half per cent. for advancing, is virtually and substantially to agree to lend him money at an interest of ten and one-half per cent. But this the law forbids: having fixed eight per cent. as the highest rate which can be lawfully stipulated. (*By act of* 1844, *convention interest was limited to eight per cent.*) It must be observed that this charge of two and one-half per cent. for advancing, cannot be referred to the trouble or labor of the plaintiff in conducting the planter's business," etc.

The case, from which we have quoted, was between a sugar planter and his factor, and is similar, in many respects, to the one now before us. The planter was charged two and a half per cent. for advancing, and eight per cent. interest, which he secured by mortgage. The charge for advancing was held usurious. See, also, to the same point, *Patterson vs. Leake*, 5 *La. An. R.* 547.

In this case, Jones was charged two and one-half per cent. for advancing, and ten per cent. interest upon the sums advanced, which, according to the decisions referred to, was equivalent to *twelve and a half per cent. interest;* and this excessive and usurious interest, was carried into the sum secured by the mortgage.

Ten per cent. was the highest rate of conventional interest allowed by the law of Louisiana where the accounts were contracted, or by the statute of our State where the mortgage was executed. If, by the execution of the mortgage, Jones could have ratified interest charged at the highest conventional rate upon the accounts, as insisted by the counsel for complainants, it can hardly be pretended that he could, or did ratify and make legal, interest charged at *twelve and a half per cent.*

The mortgages and deeds of trust having been executed in this State to secure a usurious demand, by our law they would be null and void, and the Court of chancery would not enter-

tain complainants' bill to foreclose and enforce them against the plea of usury. *Ruddell et al. vs. Ambler*, present term.

But Jones, in his answer, does not insist that the mortgages, etc., shall be declared void for the usury, and the complainants turned out of Court without any relief, but merely insists that the mortgages, etc., shall be opened, and the accounts cleansed of the usurious charges, restated, etc. This the Court below should have done, and so much of its decree as refuses to do this, must be reversed.

With a view to the rendering of such decree here as the Court below should have made, we have appointed the Clerk of this Court to act as Master in chancery with directions to purge the accounts of usury, restate them, and report the balance due complainants, allowing them legal interest according to the laws of Louisiana, only to the date of the first mortgage.

From his report, which we find to be correct, it appears that the balance due from Jones on the 1st of May, 1839, was $43,-148 68, instead of $48,589 95. From this balance deduct the absolute credits allowed by Wilson, $6,181 19, and the remainder is $36,967 49, instead of $42,408 76, the amount recited in the first mortgage. Regarding the bond for $5,000 as extinguished by this reduction, the master, under our directions, has treated the $36,967 49, as the true amount of debt secured by the mortgages, and allowed complainants interest thereon from the 1st of May, 1839, at the rate of eight per cent. per annum, this being the rate which Jones agreed by the terms of the mortgages to pay upon the amount due upon the account stated; After allowing Jones credit for all payments made by him after the date of the first mortgage by proceeds of cotton, etc., less the value of supplies furnished him by complainants, it appears that the balance against him on the 2d of Nov., 1853, the date of the final decree in the Court below was $4,330 84, which is the amount that should have been decreed to the complainants.

A decree will accordingly be entered here in favor of McLean and others for that sum, as of the 2d of November, 1853, to bear interest from that time forward, at eight per cent. per annum

until paid. The mortgages and deeds of trust will also be regarded as securities for this balance, and foreclosed with an order of sale, etc.

The decree rendered here will be certified to the Court below with instructions to enter it at its first term, etc., and appoint a commissioner to carry it into execution, and if the decree is not satisfied by Jones, by payment of the debt, interest, etc., within thirty days of the next ensuing term of the Court, the property embraced in the mortgages and deeds of trust, or a sufficient amount thereof for the purpose, must be sold by the commissioner, after the usual notice, on the first day of said term of said court, etc., to satisfy the decree, etc.

Absent, Hon. THOS. B. HANLY.